UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Eric Bernard, *Plaintiff*, v. Illinois Department of Corrections, *et al.*, *Defendants*. | No. 20 CV 5368 Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Plaintiff Eric Bernard ("Bernard"), an inmate in the custody of the Illinois Department of Corrections ("IDOC"), brings this civil rights action under 42 U.S.C. § 1983 against various IDOC employees and medical providers employed by IDOC-contracted health care services provider, Wexford Health Services (collectively, "Defendants"). [Dkt. 108.] In the operative complaint, Bernard alleges that Defendants committed various constitutional violations related to his physical extraction from a cell and the resulting medical treatment he received while incarcerated at Stateville Correctional Facility ("Stateville"). [*Id.*]

Defendants previously moved for summary judgment based on Bernard's alleged failure to exhaust his administrative under Seventh Circuit precedent, *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008) ("*Pavey I*"). [Dkts. 135, 138.] After determining that material disputes of fact existed for two grievances dated October 15 and October 25, 2019, the Court held a *Pavey* hearing in December 2023, and the parties

1

submitted post-hearing briefs. [Dkts. 186 at 3; 208–10; 213–15; 217; 219; 221–22.][1] For the reasons stated below, the motion is granted in part and denied in part as to the Wexford Defendants, and denied as to the IDOC Defendants.

I.     Background[2]

    A.     The October 15 and 25 Grievances

Bernard, a physically disabled prisoner with severe mental health issues, alleges that on August 27, 2019, while housed at Stateville, a tactical team unnecessarily used chemical agents and excessive force to "extract" him from his cell. [Dkts. 154, ¶5; 155, ¶6; 179, ¶¶1–3.] After doing so, Bernard sat with pepper spray (or "O.C. spray") and gas foam on his body for hours due to the medical staff's inability to wash off the chemical agents. [Dkts. 154, ¶5; 155, ¶6.] On September 6, 2019, Bernard was transferred to Dixon Correctional Center ("Dixon") and placed on various mental health crisis watches, including being sent to an offsite rehabilitation center. [Dkts. 154, ¶6; 155, ¶10; 179, ¶¶1, 6, 8.] Bernard eventually returned to Dixon's infirmary, but he did not receive the Dixon orientation manual, which contained instructions on how to properly file a grievance, until October 15, 2019. [Dkts. 154, ¶¶7–8; 155, ¶11.]

Under the Illinois Administrative Rules, Bernard had sixty days to grieve the August 27 incident. 20 Ill. Admin. Code § 504.870(1)(4). Bernard did so three times

---

[1]     Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.
[2]     The Court provided a fulsome background of this case and an overview of the relevant grievance procedures for IDOC inmates in its August 28, 2023 Order ("Order") [Dkt. 186.] The Court only includes facts needed for its exhaustion analysis.

through the Dixon Grievance Office; at issue here are two grievances dated October 15 and 25, 2019. [Dkts. 154, ¶¶14, 22; 155, ¶¶17, 26.] The Court previously concluded that Bernard's third grievance from October 27 was unexhausted as a matter of law. [Dkt. 186.]

> The instructions on the face of the grievance form state:
>
> Complete [ ] and send to …
>
> **Counselor**, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the [ARB].
>
> **Grievance Officer**, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
>
> […]
>
> **Administrative Review Board**, only if the issue involves protective custody, involuntary administration of psychotropic drugs, issues from another facility except [medical and][3] personal property issues, or issues not resolved by the Chief Administrative Officer.

[Dkts. 217-3 (10/15/19 grievance); 217-4 (10/25/19 grievance).] The Dixon orientation manual states:

> In addition to protective custody placement, direct reviews by the Administrative Review Board has been expanded to also include involuntary administration of psychotropic medication and disciplinary proceedings or other issues aside from personal property issues that were initiated at a facility other than the currently assigned facility, including transfer denials by the Office of the Transfer Coordinator.

[Dkt. 217-6 at 33–34.]

Bernard's October 15 grievance checked the box indicating that the nature of the grievance was "staff conduct," and in the narrative section, he described the

---

[3] The bracketed language appears on the October 25 grievance form but not on the October 15 grievance form.

3

August 27, 2019 incident at Stateville, including how he was handcuffed and sprayed with OC spray. [Dkt. 217-3.] Bernard submitted this grievance to the Dixon Grievance Office through institutional mail; it was stamped as received on October 21, 2019. [Dkts. 154, ¶18; 179, ¶28.] The grievance was returned to Bernard because it was submitted through institutional mail instead of the grievance box. [Dkts. 154, ¶18; 215 at 347.] Bernard resubmitted the October 15 grievance to the Grievance Office using the grievance box, which it received on October 31, 2019. [*Id.*] The grievance was eventually reviewed by Bernard's counselor, Sara Johnson, who returned it to him on December 16, 2019. [Dkt. 217-3.] Johnson's response checked the box indicating the grievance was "outside jurisdiction of this facility. Send to [ARB]." [*Id.*] Bernard resubmitted the October 15 grievance to the ARB, who received it on December 26, 2019 and rejected it as untimely on January 3, 2020. [*Id.* at 3.]

Bernard's October 25, 2019 grievance checked the box indicating that the nature of the grievance was a "disciplinary report" dated August 27, 2019 issued at Stateville. [Dkt. 217-4.] In the narrative section, Bernard described his complaints about four tickets issued to him at Stateville that Bernard alleges were improperly sustained at an adjustment committee hearing. [*Id.*] Bernard submitted the October 25 grievance through the grievance box; the Dixon Grievance Office stamped it received on October 28, 2019. [Dkt. 217-4 at 1.] Dixon Grievance Officer Christine Terry ("Terry") denied the grievance, the Chief Administrative Officer affirmed the denial, and the grievance was returned to Bernard on June 4, 2020. [*Id.* at 4.] Bernard appealed the denial to the ARB, who received the appeal on August 7, 2020 and

4

denied it by checking the box stating "[ARB] received the appeal 30 days past date of [CAO's] decision; therefore, this issue will not be addressed further." [*Id.* at 5.]

Bernard maintains that both the October 15 and 25 grievances complied with Dixon's grievance process, and that any failure to comply with the written procedures contained on the grievance form or in the grievance manual is excused because he submitted them in conformity with informal grievance practices at Dixon. [Dkt. 172 at 24–26; 219; 221.] Defendants argue that Dixon had no informal or "alternative" grievance procedure and that Bernard should have but failed to timely submit the grievances directly to the ARB within 60 days of the August 27, 2019 incident. [Dkt. 217.]

### B. The Hearing

To resolve the factual disputes regarding exhaustion, the Court held an evidentiary hearing on December 13–14 and December 20, 2023. [*See* Dkts. 186; 208–10.] Specifically, the Court took testimony and received evidence on the following questions: (1) Bernard's understanding of the grievance process at Dixon, (2) the Dixon orientation process regarding the grievance procedure and the manual's instructions on how to grieve incidents at other facilities, and (3) the Dixon grievance process in practice, including IDOC rules as written or any other "accepted means of submitting a grievance" within the prison. [Dkt. 186 at 3 (quoting *Curtis v. Timberlake*, 436 F.3d 709, 711–12 (7th Cir. 2005)).] The Court heard testimony from: (1) Bernard, (2) Sara Johnson, a Dixon Counselor, (3) Christine Terry, a Dixon Grievance Officer, (4) Brett Wells ("Wells"), a Dixon Counselor and who became a

5

Grievance Officer at Dixon in 2020, and (5) Margaret Madole ("Madole"), the ARB Chairperson.[4]

## II. Analysis

### A. Exhaustion of Available Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust their facility's administrative remedies before bringing civil rights suits concerning prison conditions. 42 U.S.C. § 1997e(a); *see also Miles v. Anton*, 42 F.4th 777, 780 (7th Cir. 2022). "Failure to exhaust is an affirmative defense, so the defendants bear the burden of proof and cannot shift it to require [a plaintiff] to show that administrative remedies were unavailable." *Gooch v. Young*, 24 F.4th 624, 627 (7th Cir. 2022) (citation omitted*); see Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018) (holding that "[i]t was not [plaintiff's] burden to establish that the grievance process was unavailable"). "Courts analyze a prisoner's exhaustion under the preponderance of the evidence standard." *Price v. Fed. Bureau of Prisons*, 2022 WL 972294, at *3 (N.D. Ill. Mar. 31, 2022) (collecting cases); *Williams v. Baldwin*, 239 F. Supp. 3d 1084, 1089 (N.D. Ill. 2017). Whether a claim has been exhausted under Section 1997e(a) is a determination for a judge—not a jury—to make. *See Pavey I,* 544 F.3d at 741–742. If the plaintiff has exhausted his remedies, the case will proceed on the merits. *Id.* at 742.

---

[4] The *Pavey* hearing was conducted jointly with Case No. 23-cv-5383, a related case filed by Bernard. While Madole was only designated as a witness in Case No. 23-cv-5383, [Dkt. 196], she testified about the grievances process in this case as well. [*See e.g.*, Dkts. 220; 221.]

6

As an inmate in IDOC, Bernard was required to abide by the grievance process outlined in the Illinois Administrative Code. 20 Ill. Admin. Code §§ 504.800 *et seq*. As previously discussed, IDOC's grievance procedures first require inmates to file their grievance with a counselor within sixty days of discovering "the incident, occurrence or problem that [gave] rise to the grievance." *Id.* at § 504.810(a). A Grievance Officer must "consider the grievance and report his or her findings and recommendations in writing to the Chief Administrative Officer within two months after receipt of the grievance, when reasonably feasible under the circumstances." *Id.* at § 504.830(e). If the inmate is unsatisfied with the CAO's response, he can file an appeal to the Director of the IDOC through the Administrative Review Board ("ARB"). *Id.* at § 504.850(a).

The PLRA exhaustion requirement "does not 'demand the impossible.'" *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018) (citation omitted). A prisoner is not required to exhaust the administrative remedies if those remedies are not "available." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). "An 'available' remedy is one that is 'capable of use for the accomplishment of a purpose' and 'is accessible or may be obtained.'" *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)). Available remedies "may include both written policies and informal procedures" that inmates know about, and the jail uses and accepts. *Id.* at 1321–22; *see Lanaghan*, 902 F.3d at 689.

Broadly speaking, there are at least three circumstances when administrative remedies can be considered unavailable under the PLRA. *Ross*, 578 U.S. at 643. First,

7

if an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"—then it is not available to inmates. *Id.* Second, if administrative rules are so opaque or confusing that "no reasonable prisoner can use them," they are not considered available. *Id.* at 644 (cleaned up). Third, if prison administrators or staff "thwart inmates from taking advantage of a grievance process[,]" then the process is unavailable. *Id.* This can happen through "affirmative misconduct," such as refusing to provide or respond to grievance forms or threatening inmates with negative consequences for grieving. *Hernandez v. Dart*, 814 F.3d 836, 840, 842 (7th Cir. 2016). But it also "extends beyond 'affirmative misconduct' to omissions by prison personnel, particularly failing to inform the prisoner of the grievance process." *Id.*

### B. Findings of Fact

Because the October 15 and 25 grievances concerned events at a facility other than Dixon, the Court agrees with Defendants that Bernard failed to follow a written policy requiring that he submit his grievances directly to the ARB. Though the grievance form and orientation manual are hardly models of clarity, the matters Bernard grieved arose from an incident at Stateville, not Dixon. Because Bernard was not housed at Stateville in October 2019 when he submitted the grievances, his complaints about staff conduct and improperly issued disciplinary reports should have been submitted directly to the ARB, for they concerned "issues from another facility" that were not related to his personal property. [Dkts. 217-3; 217-4.] This is consistent with the orientation manual, which provides that ARB review includes

8

"other issues aside from personal property issues that were initiated at a facility other than the currently assigned facility." [Dkt. 217-6 at 33–34.][5]

The crux of Bernard's argument, however, is that he followed the grievance procedure as it was accepted and practiced at Dixon in 2019. [Dkt. 219.] In support, he points to Terry's testimony, who explained that, in response to inmate complaints that the Grievance Office was not receiving grievances, Dixon provided inmates with a grievance "receipt" using the CHAMP system, first stamping the grievance as received, then assigning it a number, and finally forwarding the grievance "to whatever party it needed to be forwarded to." [Dkt. 215 at 11.][6] Terry testified that a grievance sent to the Grievance Office using institutional mail instead of the grievance box would be logged but "returned to the inmate with a note saying to please submit through the appropriate channels"—*i.e.*, "the grievance box or handing the grievance to a counselor." [Dkt. 215 at 11, 18–20.] Defendants, on the other hand, deny that any alternative grievance process existed at Dixon, pointing to the testimony of both Johnson and Wells, who testified that there was no alternative

---

[5] Although the October 15 grievance did not check the box indicating the nature of the grievance was "medical treatment," the narrative unquestionably raised medical issues. Without a doubt, there is conflicting evidence in the record about whether medical issues may only be submitted to the ARB directly. The other grievance form at issue here expressly states an inmate should *not* send a grievance to the ARB directly if it "*involves issues from another facility except medical . . .*" [Dkt. 217-4.] And a Stateville Memorandum dated September 9, 2019 informed Bernard, "Your grievance(s) was/(were) not reviewed by medical staff prior to you transferring. Per DR504, '*all medical issues are to be addressed at the offender's current facility.*'")

[6] Terry testified that logging a grievance using the CHAMP system "was important" because of "a lot of unfounded claims that the grievance office was not receiving grievances. They were tearing them up, they weren't responding to them, offenders were making claims that they submitted paperwork, and there was no paper trail that ever occurred. So, they created this system to provide a receipt and documentation paper trail for the offender." [Dkt. 215 at 11.]

9

policy or procedure for inmates to file a grievance directly with the ARB. [Dkts. 213 at 161–62, 216; 217 at 10; 220 at 3.]

"[A]dministrative-exhaustion rules are not exclusively 'those reduced to *writing*.'" *Curtis*, 436 F.3d at 711–12 (emphasis in original). The "rules for administrate remedies may include both written policies and informal procedures." *Crouch*, 27 F.4th at 1322. An inmate who fails to comply with the written terms of a grievance policy may still show he exhausted administrative remedies by showing he complied with informal exhaustion procedures. *Id.* In *Curtis*, for example, the Seventh Circuit reversed summary judgment where it was disputed whether the plaintiff submitted a grievance as required by the "administrative rules" when he hand delivered grievances to a social worker rather than placing them in the designated lockbox. *Id.* at 710–12.

Defendants' response brief does not at all engage with *Crouch* or *Curtis*, relying instead on its primary argument that a reading of the written instructions explained that grievances should be submitted directly to the ARB. But Bernard testified that while in the healthcare unit at Dixon in October 2019, he understood that he had to submit grievances using the grievance box. [Dkt. 214 at 69 ("Q.: Was there a place in the healthcare unit that you were supposed to submit your grievances at Dixon? A. Yes. Q. And what was -- where was that? A. Like, grievance boxes.").] And while Wells' testimony contradicts Terry's testimony, the Court agrees with Bernard that the "most knowledgeable person[ ] of the grievance process"—Terry, a Dixon Grievance Officer during the relevant period in 2019—apparently interpreted the

10

grievance process the same way Bernard did. [Dkt. 219 at 5.] Even the Dixon orientation manual supports Terry's understanding. [Dkt. 217-6 at 32 ("Effective 12/1/2018 new grievance guidelines were established for all facilities. All grievances are to be deposited in the grievance box located within each housing unit.")]

On this record, and in view of the evidence presented, the Court credits Terry's testimony that there was an accepted practice at Dixon in 2019 that allowed grievances to be submitted to the Grievance Office.

There is also sufficient evidence that Bernard complied with that practice, at least until the grievance process became unavailable to him. As to the October 15 grievance, it was stamped received by the Grievance Office on October 21 and then returned to him. According to Terry, because the grievance was submitted through institutional mail, it would have been returned to Bernard "with a note" to submit it through the "appropriate channels," and Terry explained that was done either by using the grievance box or handing the grievance to a counselor. [Dkt. 215 at 11.] Bernard followed these instructions, and resubmitted the grievance using the box. The Grievance Office received it for the second time and forwarded it to Bernard's counselor, Sara Johnson. [Dkt. 215 at 19–20.]

The Court concludes that the grievance process became unavailable to Bernard at that point. First, a note telling Bernard to resubmit the grievance to the Grievance Office using the grievance box or by handing the grievance to a counselor was an incorrect instruction. Here, the "appropriate channel[ ]" would have been a note instructing him to send the grievance directly to the ARB. "[P]rison authorities may

11

not employ their own mistake to shield them from possible liability." *Dole v. Chandler*, 438 F.3d 804, 811 (7th Cir. 2006). When "prison officials [are] responsible for the mishandling" a grievance, it cannot be said that an inmate has failed to exhaust his remedies. *Id.*; *Thomas v. Reese*, 787 F.3d 845, 847–48 (7th Cir. 2015) (remedies unavailable where correctional officer tells prisoner that prisoner cannot file grievance when in fact prisoner can do so). Dixon officials eventually did tell Bernard the grievance should have been sent to the ARB, but not until December 2019 when Johnson checked the box indicating it had been improperly submitted and should have been sent to the ARB. [Dkt. 217-3 at 1.][7] By that point, the time for submitting a timely grievance to the ARB had long since passed. This series of events rendered the process practically unavailable.

Regarding the October 25 grievance, Bernard submitted this grievance to the Grievance Office using the grievance box (it was not returned to Bernard with a note about "appropriate channels" because he submitted it through the grievance box.) Though improperly submitted, Bernard did not receive a response until seven months later in June 2020. There was nothing for Bernard to do while he waited—the informal practice for submitting grievances gave Bernard no reason to know he had submitted the grievance incorrectly and by the time he received a response, the time to submit a grievance directly to the ARB had long since passed.[8] This seven month

---

[7] Bernard then sent the grievance to the ARB who received it on December 26, 2019, and later rejected it.
[8] Bernard then appealed this denial to the ARB, who received the grievance on August 7, 2020 and denied it as untimely.

12

wait without a response was long enough to establish practical unavailability. *Morgan v. Wexford Health*, 2022 WL 3354816, at *4 (N.D. Ill. Aug. 13, 2022).

Failure to exhaust is an affirmative defense, so ultimately, Defendants bear the burden of proving that an administrative remedy was available. *Crouch*, 27 F.4th at 1320; *Gooch*, 24 F.4th at 627. For the reasons discussed above, Defendants have failed to meet their burden.

### III. Adequate Notice as to the October 25 Grievance

The Wexford Defendants argue that the October 25 grievance failed to provide sufficient detail so as to put the Wexford Defendants on notice of the claims against it because the grievance did not reference any medical staff or relate to Bernard's medical care. [Dkts. 217 at 11; 219 at 5.] The Court agrees.

Seventh Circuit caselaw establishes that a grievance provides sufficient notice if it "alert[s] prison officials to a problem" and provides an opportunity for the agency to correct its mistakes before a lawsuit is filed. *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011). A grievance need not explicitly name defendants by name, but in the context of a claim of inadequate medical treatment, it must provide sufficient notice of treatment problems. *See Morgan v. Wexford*, 2022 WL 3354816, at *3 (N.D. Ill. Aug. 13, 2022).

Here, the October 25 grievance does not reference any Wexford Defendants, nor does it describe conduct related to medical care or acts that can be imputed to any medical provider arising from a treatment related issue. Bernard's response brief does not dispute this point, so the Court concludes that the October 25 grievance

cannot serve to exhaust Bernard's claims as to the Wexford Defendants, only as to the IDOC Defendants.

## IV. Conclusion

For the reasons stated above, summary judgment is denied as to the IDOC Defendants as to both the October 15 and 25 grievances. As to the Wexford Defendants, summary judgment is denied as to the October 15 grievance, and granted as to the October 25 grievance.

Enter: 20-cv-5368
Date: May 13, 2024

_____
Lindsay C. Jenkins
United States District Judge